Doerfer, J.
INTRODUCTION
The plaintiff Subaru of New England, Inc. filed the present action seeking a declaratoiy judgment that its approval of the purchase and sale of the assets of an existing Subaru dealership in Salem and relocation of that dealership to Danvers complies with the requirements of G.L.c. 93B, §4(3)(1). This matter is before the court on the plaintiffs motion for summary judgment pursuant to Mass.R.Civ.P. 56. Also before this Court is defendant Subaru of Wakefield, Inc.’s motion for a preliminary injunction. For the reasons discussed below, the plaintiffs motion for summary judgment is DENIED. Further, the defendant’s motion for a preliminary injunction is DENIED.
BACKGROUND
Plaintiff Subaru of New England, Inc. (SNE) is in the business of distributing new Subaru motor vehicles, parts and accessories to franchised Subaru dealers in the six New England states pursuant to an exclusive distributorship agreement with importer Subaru of America, Inc. (SOA). Defendant Subaru of Wakefield, Inc. (Wakefield) has been a franchised Subaru dealer located at 888 Main Street in Wakefield, Massachusetts since January 15, 1991. Defendant MZR, Inc. dba President Subaru (President) has been a franchised Subaru dealer located at 277 Main Street in Wilmington, Massachusetts since October 2, 1992.
Ira Rosenberg operates several automobile dealerships, Ira Lexus and Ira Porshe-Audi-Mazda, at the junction of Routes 114 and 195 in Danvers, Massachusetts, an area commonly referred to as the “Auto Row.” In May of 1996, Ira’s son David Rosenberg (Rosenberg) advised SNE of his interest in becoming a Subaru dealer. Rosenberg proposed to purchase the assets of an existing Subaru franchise, Gauthier Motors, located on Canal Street in Salem, relocate it approximately 4.5 miles West to the Auto Row in Danvers, and operate it under the name Ira Subaru. SNE analyzed Rosenberg’s proposal by reviewing and updating its market study of the geographic area at issue to determine whether the relocation would result in the introduction of an additional franchisee within the relevant market area of either Wakefield or President, thus requiring formal notice of a new dealer appointment pursuant to G.L.c. 93B, §4.
SNE considered, among other factors, the demographics of the area, the demand for Subarus in the area, Subaru’s market penetration in the area, the effectiveness of the existing Subaru dealers within 20 miles of Rosenberg’s proposed Danvers location and the areas into which those dealers sold Subarus, the convenience of the public of the proposed relocation, and the impact of the relocation on existing dealers. Pursuant to c. 93B, §4(3) (1), a dealer’s relevant market area is defined as:
The more narrowly defined and circumscribed geographic area immediately surrounding its existing dealer location within which it obtained, during ... the 3-year period immediately preceding the date of . . . notice of intent to grant or enter into an additional franchise or selling agreement ... at least two-thirds of (1) its retail sales of new motor vehicles of said line make or (2) its retail service sales . . . G.L.c. 93B, §4(3)(1) (1994).
Although SNE did not have the full retail service sales data of Wakefield and President, it analyzed both dealers’ new vehicle sales and Wakefield’s warranty service sales for the preceding three years. SNE concluded that both the existing Gauthier Motors location in Salem and the proposed relocation site in Danvers were within Wakefield and President’s respective relevant market areas. Therefore, SNE believed that formal notice to Wakefield and President of Rosenberg’s proposal was not required under c. 93B, §4(3)(1) since the relocation would not produce a net increase in the number of Subaru franchises in either Wakefield or President’s relevant market area.
Despite this conclusion, SNE’s Vice President of Market Development, H.J. Burbank (Burbank) telephoned Wakefield’s owner and General Manager, Richard Kalika (Kalika) in early June and informed him that SNE was considering the proposed relocation of the Gauthier Motors Subaru franchise from 135 Canal Street in Salem to the junction of Routes 114 and 195 in Danvers, where it would be owned and operated as Ira Subaru. At this point, Gauthier Motors and Rosenberg were still negotiating a final Buy/Sell agreement and SNE had not yet received a formal dealership application from Rosenberg. Thereafter, by letter dated *426 June 19, 1996, SNE formally notified Wakefield and President that SNE intended to appoint Rosenberg as an authorized Subaru dealer on August 23rd, reiterated its position that neither dealer had standing under c. 93B, §4(3)(1) to protest the relocation of the franchise, and requested that Wakefield and President submit their respective service sales information for the preceding three years no later than June 26th, so that SNE could further evaluate their relevant market areas.
President’s CEO, Daniel O’Connor, notified SNE by letter dated June 25, 1996, that President intended to protest the relocation of the Gauthier Motors franchise to Danvers. Similarly, by letter dated June 26, 1996, Kalika gave SNE thirty days notice that Wakefield intended to protest the proposed relocation and seek an injunction against the appointment of Ira Subaru in Danvers pursuant to c. 93B, §4(3)(1). Thereafter, by letter dated July 9, 1996, Kalika informed SNE that it would be impossible for Wakefield to compile its retail service data by SNE’s deadline because the information was not computerized.
The following day, SNE met with representatives of President to review SNE’s market study concerning the effects of the proposed relocation. President’s representatives acknowledged that the proposed relocation would increase the visibility of Subaru in the Salem, Wakefield and Wilmington Areas of Responsibility but then demanded various monetary accommodations in exchange for the withdrawal of President’s protest, which were refused. President’s James Kemos and Wakefield’s Kalika had numerous conversations concerning the effect that Ira Subaru’s operation in Danvers would have on their respective dealerships. Kemos eventually informed Kalika that President had decided to withdraw its protest against the proposed relocation because of the potential cost of pursuing litigation against SNE.
Meanwhile, on July 17, 1996, Scott Scimeme, Wakefield’s Director of Operations, Larry Belsky, a stockholder, and Kalika met with Joseph Applebe, SNE’s General Manager, Richard Cirami, SNE’s VP for Sales and Distribution, Ernest Boch, SNE’s CEO, and Burbank to discuss Rosenberg’s appointment and the relocation of the franchise to Danvers. However, after Wakefield refused to withdraw its protest, Boch handed Kalika a copy of SNE’s complaint in the present suit and informed him that Wakefield would be served with process the same day.
SNE’s action, filed on July 12, 1996, seeks a declaratory judgment that the proposed relocation does not constitute the appointment of “an additional franchisee” within the meaning of G.L.c. 93B, §4(3)(1) and that therefore, Wakefield and President have no right to protest the relocation under the statute. In the alternative, SNE seeks a declaration that it has given proper notice of the proposed relocation to Wakefield and President and that the appointment of Rosenberg and relocation of the franchise complies is not arbitrary under c. 93B. Wakefield has filed a counterclaim alleging that the proposed relocation violates G.L.c. 93B, §§3 & 4(3)(1) and seeking an injunction enjoining SNE from granting Rosenberg a franchise in Danvers and relocating Gauthier Motors to Danvers, as well as damages, attorneys fees and costs.
SOA and SNE finalized Rosenberg’s appointment as a Subaru dealer in mid-August 1996 and since that time Ira Subaru has been operating from the former Gauthier Motors facility on Canal Street in Salem. SNE has withheld final approval of the dealership’s relocation to Danvers pending the outcome of the present litigation.
On August 21, 1996, this Court (Doerfer, J.) entered a Scheduling Order requiring Wakefield to submit its service sales records to SNE by August 29, 1996. As a result of this order, it was revealed that Wakefield was unable to account for or verify its service sales records due to a fraudulent warranty scheme which had occurred at Wakefield Subaru during the preceding three years. The fraud originally surfaced in connection with an audit performed by SOA of Wakefield’s books and records for claims paid during the calendar years 1994 and 1995. Shaun McIntyre (McIntyre), an SOA Warranty Audit Manager who reviewed Wakefield’s documentation for the warranty claims, noticed certain discrepancies and suspected that there were fraudulent claims being submitted with respect to a recall campaign being conducted by SOA. During the course of his investigation, McIntyre and the SOA audit team reviewed approximately forty percent of the warranty claims made during the period at issue, which represented approximately sixty percent of the total warranty dollars.
The investigation revealed that Wakefield’s Director of Service and Parts, Larry Olanyk (Olanyk), had submitted fictitious service repair orders to SOA in order to get reimbursed for warranty service which Wake-field had in fact never performed. Based on the level of fraud uncovered by SOA, McIntyre recommended that Kalika pay an independent investigator to review the audit to determine whether Wakefield’s ownership had been involved in the fraud, a recommendation made in only about 4 of the 100 cases McIntyre has investigated. James Ring of Choate, Hall & Stuart conducted the independent investigation and determined that Kalika neither knew of the fraud nor had reason to suspect it. SOA’s final disposition of the warranty audit was to charge back $91,581 in fraudulent claims to Wakefield and require Wakefield to reimburse the $6,048 cost of the investigation. Because Kalika did not have personal knowledge of the warranty fraud, SOA did not terminate Wakefield’s dealership. Although Olanyk was fired as Director of Service and Parts, Wakefield re-hired him to the newly created position of Director of Customer Relations *427 after he reimbursed Wakefield his profit on the fraudulent claims, about $2,000.
In connection with the present action, on September 17, 1996, SNE noticed Olanyk’s deposition, which was scheduled for October 11, 1996. SNE and Wake-field have stipulated that when Olanyk learned that SNE intended to depose him and inquire into the circumstances surrounding Wakefield’s retail warranty service sales for the preceding three years and Olanyk’s role in the creation of fictitious service sales to obtain warranty reimbursement from SOA, Olanyk notified SNE through counsel that he would refuse to answer such questions pursuant to his Fifth Amendment right against self-incrimination.
SNE now moves for summary judgment on its complaint and on Count I of Wakefield’s counterclaim on the ground that Wakefield has no reasonable expectation of establishing standing to protest the proposed relocation under G.L.c. 93B, §4(3)(1) because it cannot demonstrate that the relocation would introduce an additional franchisee into its relevant market area. In addition, Wakefield moves for a preliminary injunction prohibiting the relocation of Ira Subaru from Salem to Danvers.
DISCUSSION
I. SNE’s MOTION FOR SUMMARY JUDGMENT
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Community Nat’l. Bank v. Dawes, 369 Mass. 550, 553 (1976); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving parly to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
General Laws c. 93B regulates dealings among motor vehicle manufacturers, distributors and dealers, and proscribes specific unfair and deceptive practices in the industry. Reiter Oldsmobile, Inc. v. General Motors Corp., 378 Mass. 707, 708 (1979); Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., 14 Mass.App.Ct. 396, 402, rev. den., 387 Mass. 1103 (1982). A crucial aspect of the statute is the regulation of the granting of new franchises near established ones to protect franchisees from destructive intra-brand competition and the unequal economic power of manufacturers, recognition of the potential unfairness that “having invested in his dealership, a dealer who has displeased the manufacturer, or who simply appears to be dispensable, finds his business turned into a losing venture overnight by the award of a new franchise around the comer, and, it may be, without any practical benefit to, or indeed, with negative effects on, the buying public.” Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 320 (1978). See also Heritage Jeep-Eagle, Inc. v. Chrysler Corp., 39 Mass.App.Ct. 254, 259, rev. den., 421 Mass. 1107 (1995).
Thus, pursuant to Chapter 93B, Section 4(3) (1), it is an unfair competitive practice for a manufacturer, distributor, wholesaler, or factory branch or division to:
arbitrarily and without notice to existing franchisees as hereinafter provided, to grant or enter into a franchise or selling agreement to or with an additional franchisee who intends or would be required by such franchise or selling agreement to conduct its dealership operations from a place of business situated within the relevant market area of an existing franchisee or franchisees representing the same line make . . . G.L.c. 93B, §4(3)(1) (1994).
Further, a distributor which intends to grant or enter into an additional franchise or selling agreement must give sixty days’ written notice of such intent to each motor vehicle dealer with a franchise or selling agreement covering the same line make within a twenty mile radius of the location of the proposed franchise. G.L.c. 93B, §4(3)(1) (1994). An existing franchisee may then, prior to the date of the proposed grant or appoihtment specified in the notice, petition the Superior Court for a determination whether the appointment of the additional franchisee is arbitrary. Id. The statute lists eight pertinent but noninclusive circumstances for the court to consider in making that determination. Id.
It is now clear that the term “additional franchisee” as used in c. 93B, §4(3)(1) includes the sale of an existing franchise and its relocation by the buyer to a site in the relevant market area of another franchisee if the net result of the relocation is an increase in the number of franchises, and thus intra-brand competition, in the plaintiffs relevant market area. Heritage Jeep-Eagle, Inc. v. Crysler Corp., supra at 259-260, 263. However, the transfer of an existing franchise from one location in the plaintiffs relevant market area to a different location within that same relevant market area does not implicate §4(3) (1) because it does not augment the number of franchisees in the plaintiffs relevant market area. 128 Sales, Inc. v. Saab-Scania of America, Inc., Civil No. 885346 (Middlesex Super. Ct. Oct. 6, 1988) (dismissing dealer’s claim under the statute where franchise initially in plaintiffs relevant market area was relocated to a different town in that same relevant market area); Courtesy Jeep-Eagle, Inc. v. Chrysler Corp., Civil No. 933122 (Middlesex Super. Ct. Jan. 17, 1997) (granting summary judgment for distributor on the ground that *428 dealer cannot recover as a matter of law where franchise was transferred wholly within plaintiffs relevant market area). See also Heritage Jeep-Eagle, Inc. v. Crysler Corp., supra at 258-59 n. 7.
SNE contends that it is entitled to judgment as a matter of law on its complaint and Count I of Wakefield’s counterclaim on the ground that Wakefield cannot establish standing to protest the proposed relocation of Ira Subaru under G.L.c. 93B, §4(3)(1) because both the former Gauthier Motors location in Salem and the proposed location in Danvers are within Wakefield’s relevant market area, such that the relocation does not constitute the appointment of an “additional franchisee” within the meaning of the statute.
Pursuant to c. 93B, §4(3)(1), a dealer’s relevant market area with respect to any given line make is defined as:
the more narrowly defined and circumscribed geographical area immediately surrounding its existing dealer location within which it obtained, during the period of time the dealership business has been operated from said location or the three-year period immediately preceding the date of said notice of intent to grant or enter into an additional franchise or selling agreement, whichever is the lesser, at least two-thirds of (i) its retail sales of new motor vehicles of said line make or (ii) its retail service sales, regardless of whether its franchise or selling agreement delineates or establishes a specific area of responsibility or whether, by custom or usage, a specific area of responsibility has been established or another motor vehicle dealer with a franchise or selling agreement covering the same line makes has a place of business in such market area. G.L.c. 93B, §4(3)0) (1994).
Thus, in evaluating the granting of new franchises, §4(3)(1) requires the court to analyze the hard statistical data to draw two geographic areas representing the plaintiffs relevant market area, and after the areas are platted, to simply choose the smaller of the two. Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., supra at 415.
As SNE’s Vice President of Market Development, H.J. Burbank is responsible for franchising, refranchising, upgrading and evaluating the performance of all Subaru dealerships in New England. Over the past 16 years in this capacity he has prepared numerous market studies including analyses of dealers’ “relevant market areas” as that term is defined under G.L.c. 93B, §4(3)(1). In connection with the proposed relocation of Ira Subaru from Salem to Danvers, Burbank performed such a market study. Because all dealers provide SNE with their new vehicle sales in the regular course of business, Burbank had available to him Wakefield’s new vehicle sales, customer names and information for the relevant period, June 1993 through June 1996. After analyzing this data, Burbank concluded that with respect to new vehicle sales, both the former Gauthier Motors location in Salem and the proposed Ira Subaru location in Danvers are inside Wakefield’s relevant market area.
There is no material dispute as to SNE’s conclusion that Wakefield lacks standing to challenge the proposed relocation when its relevant market area is calculated based on new vehicle sales. Kalika concedes in his deposition that Wakefield’s own analysis of new vehicle sales indicates that both Gauthier Motors and the proposed Danvers location are within its relevant market area:
Q: What did your analysis of new vehicle sales show?
A: It showed that both Salem and Danvers, relevant to this case, was in the two-thirds area of my sales.
Q: And what, if any, conclusion did you draw from that?
A: My conclusion was that the case would be based on retail service data.
Thus, because it is undisputed that the proposed relocation would not increase the number of franchises in Wakefield’s relevant market area as calculated by new vehicle sales, it does not constitute the appointment of an “additional franchisee” within the meaning of c. 93B, §4(3)(1)- Accordingly, based on new vehicle sales, Wakefield lacks standing to protest the appointment of Rosenberg as a Subaru dealer and relocation of the franchise from Salem to Danvers.
SNE further contends that Wakefield has no reasonable expectation of proving standing under c. 93B, §4(3)(1) based on retail service sales, because its warranty service sales[2] data is unreliable and cannot be verified due to the fraud that occurred at the dealership. Under §4(3)(1), a protesting dealer bears the initial burden of producing evidence that the grant or appointment at issue would introduce an additional franchisee into its relevant market area. Ricky Smith Pontiac, Inc. v. Subaru of New England, supra at 413; Richard Lundgen, Inc. v. American Honda Motor Co., Civil No. 921091 (Worcester Super. Ct. Oct. 11, 1994). In support of its assertion of standing, Wakefield has introduced the affidavit of Robert Brandwein, a trained economist and President of Policy and Management Associates, Inc., a consulting corporation that provides assistance in analyzing industrial and commercial activities.
Brandwein, who has testified as an expert witness in several c. 93B cases in Barnstable, Dukes, Fall River, Worcester and Suffolk Superior Court, analyzed Wakefield’s relevant market area by reviewing its retail auto sales and service records from June 1, 1993 through May 31, 1996, as well as U.S. Bureau of Census data, Federal Reserve reports, U.S. Departments of Labor and Commerce statistics and data and population projections of the Massachusetts Institute of Social and Economic Research at the University of *429 Massachusetts. Brandwein determined that Wakefield’s relevant market area for retail service sales is more narrowly circumscribed than its relevant market area for new vehicle sales and that, while the former Gauthier Motors location in Salem is not in Wakefield’s relevant market area based on retail service sales, the proposed Ira Subaru location in Danvers would be. Thus, Brandwein concluded that the proposed relocation would increase the number of franchises in Wakefield’s relevant market area for retail service sales, constituting the appointment of an “additional franchisee” under c. 93B, §4(3)(1) and conferring standing on Wakefield to petition this Court for a determination of the proposed appointment and relocation is arbitrary.
Nonetheless, SNE contends that Brandwein’s affidavit does not constitute admissible evidence competent to create a genuine issue of material fact as to Wakefield’s relevant market area because the underlying retail service sales data used by Brandwein is inherently unreliable due to the warranty fraud perpetrated at the dealership. SNE further contends that due to the unreliability of Wakefield’s warranty service data, it is impossible for SNE to conduct its own independent analysis of Wakefield’s relevant market area. SNE hired Urban Science Applications, Inc. (USAI), a company widely recognized in the automotive industry as the leader in assembling and analyzing data for purposes of dealer networking, location, franchising and assessing inter-brand and intra-brand market performance, to perform such an analysis. Dealers are not obligated to report all of their individual service sales information to SNE; however, they provide SNE with their gross retail service sales revenues on a monthly basis. SNE did not receive hard copies of Wakefield’s complete service sales records in the ordinary course of its business. Burbank thus submitted a document request for Wakefield’s retail service sales records for the relevant three year period so that SNE could analyze the relevant market area based on retail service sales. Mitchell J. Phillips (Phillips) , a Division Manager at USAI, attempted to analyze the service sales data provided by Wakefield for the purpose of determining its relevant market area pursuant to c. 93B, §4(3)(1).
Kalika and his staff began inputting Wakefield’s retail service sales information from approximately 19,500 repair orders into a computer on June 24, 1996. In mid-September, Phillips received computer disks from Wakefield purporting to contain its service data with a transmittal letter from Kalika to Brandwein, dated August 7, 1996, stating that the enclosed data concerned June 1993 through May 1996 and was “about 99% complete.” Shortly after Phillips began to analyze the data, he learned that Kalika had stated under oath that the data was incomplete, that there were approximately 1,100 missing invoices and that Wakefield had included certain fraudulent warranty service sales in the data which it had provided.[3] Kalika found the missing orders around October 7, 1996, finished inputting them about October 14th, and sent Phillips additional computer disks along with a new transmittal letter from Kalika to Brandwein, stating that the enclosed data was “Wakefield’s final compilation of its service data.” Thereafter, on two more occasions, Wakefield sent Phillips additional disks containing data different from the earlier numbers provided. This new data apparently excluded all warranty service sales based on the advice of counsel.
Kalika has conceded that he has no personal knowledge of the nature and scope of the warranty fraud that took place at Wakefield, and no way of knowing whether the warranty service data he provided to Brandwein and USAI is correct. As he inputted the repair orders into the computer database, Kalika took no action to determine whether those particular repairs actually took place. Admittedly, SOA’s Warranty Audit Team did not investigate any claims from the year 1993 or from January 1, 1996 through June 19, 1996, periods of time which fall within the statutorily designated period of the three previous years to be used in calculating a dealer’s relevant market area. Moreover, Kalika has conceded that he himself has no way of knowing whether any repair orders from those periods are fraudulent and that currently, there is no one who can verify the authenticity and reliability of the data. Given these circumstances, Phillips concluded that it was impossible for USAI to perform the relevant market area study, which must tract and plot a geographically precise location for each service sale obtained by Wakefield during the three year period called for by c. 93B. Phillips also concluded that Brandwein’s market analysis was unreliable because it was based on fraudulent and/or unverified data.
Accordingly, SNE contends that Brandwein’s affidavit is inadmissible and does not constitute competent evidence raising a genuine issue of material fact as to Wakefield’s standing to protest the proposed relocation. Further, SNE argues that Wakefield has no reasonable expectation of demonstrating standing based on retail service sales because the only person who could provide reliable information concerning how many additional repair orders in Wakefield’s records are fictitious, Larry Olanyk, has invoked his Fifth Amendment privilege against self incrimination. In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify on the ground of self-incrimination. Labor Relations Commission v. Fall River Educators Ass., 382 Mass. 465, 471 (1981); Department of Revenue v. B.P., 412 Mass. 1015, 1016 (1992). SNE thus argues that it is entitled to infer that Wakefield’s remaining data is tainted and unreliable, and that judgment as a matter of law should enter in its favor because Wake- *430 field concedes that it has no standing based on new vehicle sales and has no reasonable expectation of establishing standing based on retail service sales.
Wakefield counters that the calculation of a dealer’s “retail service sales” under c. 93B, §4(3)(1) neither contemplates nor requires inclusion of warranty service sales, which are customarily reported by Subaru dealers to SOA as a category separate from retail service sales and are paid for by SOA, rather than the consumer, at a wholesale rate less than that a customer would pay. Thus, Wakefield argues that a later affidavit by Brandwein, dated November 5, 1996, is admissible evidence which creates a genuine issue of material fact as to its standing under c. 93B, §4(3)(1). The November 5th affidavit states that Brandwein conducted a second market analysis of Wakefield’s retail service sales in which he calculated service sales without including any warranty repair orders, and the results were identical to his previous analysis in which warranty repair orders were included. Even excluding all warranty sales from Wakefield’s retail service sales, Brandwein concluded that the former Gauthier Motors location in Salem is not within Wakefield’s relevant market area, but that the proposed Danvers location is. Thus, the proposed relocation would result in an additional franchisee in Wakefield’s relevant market area, entitling Wakefield to protest the relocation.
SNE contends, however, that G.L.c. 93B, §4(3)(1) requires warranty service sales to be included in the calculation of a dealer’s relevant market area. SNE argues that the statutory term “retail service sales” must be interpreted according to its common sense and ordinary meaning: all sales of automobile services and repairs made to retail customers. In addition, Burbank asserts that industry practice dictates the inclusion of warranty service sales when calculating a dealer’s relevant market area because warranty service sales and non-warranty service sales are generally paid at the same rate, both are made to retail customers, and both include service work on which the dealer makes a significant profit. Phillips of USAI similarly opines that a relevant market area analysis based on retail service sales under c. 93B, §4(3)(1) must always include warranty service sales.
Finally, SNE has produced the affidavit of Daniel A. Brewer, Esq. who was the attorney of record in a §4(3)(1) case, Expressway Motors, Inc. v. GMAC Truck Division, General Motors Corp., Suffolk Superior Court Civil Action No, 93-4861G on behalf of a protesting dealer, Expressway Motors. In connection with that case, Brewer hired Brandwein as an expert to determine Expressway’s relevant market area. When calculating the relevant market area based on retail service sales, Brandwein specifically included sales reimbursed by warranty in his analysis, and did the same thing with respect to analyzing the retail service sales of the other protesting dealer in the case, Garvey Oldsmobile GMC Truck. SNE emphasizes this, along with the fact that Brandwein included warranty sales in his initial analysis of Wakefield’s relevant market area set forth in his August 15, 1996 affidavit, as evidence that the statute requires the inclusion of such data.
Chapter 93B does not define the term “retail service sales.” Moreover, there are no appellate decisions addressing the proper interpretation of this term as used in Section 4(3)(1). However, the one trial court to touch upon this issue employed a flexible ápproach to defining the term. In Lundgren v. American Honda Motor Co., Civil No. 921091 (Worcester Super. Ct. Oct. 11, 1994), it was unclear whether the plaintiff had included or excluded service repair orders performed under a new car warranty from its retail service sales when calculating its relevant market area. However, the court concluded that:
their inclusion would not, in any event, render the computations erroneous, as “retail service sales” can reasonably be read to permit the inclusion of such warranty service repairs in the ascertainment of the relevant market. Id.
The court obviously did not consider the inclusion of warranty service sales to be necessary to a calculation of a dealer’s relevant market area based on retail service sales under c. 93B, §4(3)(1). Rather, the court noted that the statute does not require the plaintiff to calculate retail service sales in any particular manner and concluded that the plaintiffs method of calculation was a “reasonably accurate method of delineating its relevant market for retail service sales on the facts of this case.” Id.
This Court agrees with the approach taken by the court in Lundgren. Given that the statute does not define the term “retail service sales” or circumscribe the proper method of calculation, it can be presumed that the Legislature did not intend to require a uniform, penny by penny accounting of a dealer’s service sales. In addition, because the calculation goes to the threshold issue of standing to protest a new dealer appointment, and not to the merits of that appointment, this Court is inclined to take an expansive view of the term “retail service sales” and err on the side of the letting the case go forward on its merits. Accordingly, this Court finds as a matter of law that c. 93B, §4(3)(1) does not mandate the inclusion of warranty-service sales in the calculation of relevant market area so long as the dealer’s method of calculation is reasonably accurate.[4]
The critical question then becomes whether the evidence proffered by Wakefield concerning its relevant market area for retail service sales is based on a reasonably accurate method of calculation. Brandwein’s November 5th affidavit states that he conducted an analysis of Wakefield’s retail service sales excluding all warranty repair data and concluded that Salem is not within Wakefield’s relevant *431 market area, but that the proposed Danvers location is.[5] Further, Kalika asserts in an affidavit that when all warranty repair orders are excluded, Wakefield’s remaining data for non-warranty service sales is accurate because all retail customers pay by cash, check or major credit card for which Wakefield has receipts and the repair order invoices were recorded by employees other than Olanyk in the regular course of business. This Court is satisfied that Wakefield has calculated its relevant market area for retail service sales with a reasonable degree of certainty. Accordingly, Brandwein’s affidavit of November 5, 1996 is sufficient to raise a genuine issue of material fact as to whether the proposed relocation will introduce an additional franchise into Wakefield’s relevant market area for retail service sales, conferring standing on Wakefield to protest under §4(3) (1), such that SNE is not entitled to summary judgment on its complaint and Count I of Wakefield’s counterclaim.
II. WAKEFIELD’S MOTION FORA PRELIMINARY INJUNCTION
Finally, Wakefield moves this Court pursuant to c. 93B for a preliminary injunction prohibiting SNE from allowing Ira Subaru to relocate from Salem to the Auto Row in Danvers. Chapter 93B, Section 4(3)(1) provides:
The court shall have authority to modify or stay the effective date of such proposed franchise or selling agreement or restrain its implementation pending a final determination of the issues raised by [the] petition. G.L.c. 93B, §4(3)(1) (1994).[6]
Since the language of c. 93B sets forth no specific test for determining a parly’s entitlement to a stay, the applicable standard is identical to that of a preliminary injunction. Foreign Motors, Inc. v. Audi of America, Inc., 755 F.Supp. 30, 33 (D.Mass. 1991).
In order to obtain a preliminary injunction, the moving party must demonstrate that without the requested relief, it would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 n. 11 (1980); Commonwealth v. Massachusetts CRINC, 392 Mass. 79, 87 (1984). The moving party must further demonstrate that there is a likelihood that it will prevail on the merits of its claim at trial. Commonwealth v. Massachusetts CRINC, supra at 87. The court must then weigh this combination of factors against the showing of irreparable harm which would ensue from the issuance of the injunction and the chance of success on the merits presented by the opposing party. Id.; Packaging Indus. Group, Inc. v. Cheney, supra at 616-17. Thus, a preliminaiy injunction shall properly issue only where the balance of hardship measured in light of the legal merits cuts in favor of the moving parly. Commonwealth v. Massachusetts CRINC, supra at 87-88; Packaging Indus. Group, Inc. v. Cheney, supra at 617; GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993).
1. Irreparable Harm
Wakefield contends that it will suffer irreparable harm if Ira Subaru is allowed to relocate to Danvers because the presence of an additional dealership a mere seventeen minute drive from Wakefield will cause a loss of business which after a year or two, will force Wakefield to close its doors, losing an investment in excess of $680,000 in the dealership. This contention is supported by the affidavit of Richard Kalika, the president and general manager of Wakefield, who states that between June 19, 1993 and June 20, 1996, Wakefield generated 2.5 million dollars of service sales in its relevant market area, 45% of which came from areas that are equally or more accessible to ihe Danvers location. Kalika opines that if Ira Subaru moves to Danvers, in the first year Wakefield will lose $120,000 in repair service sales, which contribute more than 85% of Wakefield’s net profit, because although customers are willing to drive an hour or more to purchase a car, they have their cars serviced close to home, and Ira Subaru would have a more convenient location, a more modem facility, and more massive advertising than Wakefield.
In his deposition testimony, however, Kalika concedes that he never conducted any formal impact analysis of the proposed relocation or any analysis of the statutory factors for an arbitrary appointment under c. 93B, §4(3)(1). Kalika further admits that he never studied lost opportunity, that he cannot estimate a dollar figure for the lost vehicle sales Wakefield would suffer due to the relocation of Ira Subaru, and that his estimate of a $120,000 loss in service sales is a guess based on his belief that it would be more convenient for customers to go to Danvers rather than Wakefield. Finally, Kalika concedes that he has not made any written calculation of how the $680,000 investment that the owners of Wakefield have made in their dealership will be affected by the proposed relocation. Thus, SNE moves to strike Kalika’s affidavit on the ground that because his opinion is based on pure speculation, it constitutes inadmissible and incompetent evidence.
Unlike a motion for summary judgment, however, a motion for a preliminary injunction may rely on evidence that may prove inadmissible at trial. Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 711 n. 9 (1990). The possible inadmissibility of evidence should be taken into account by the court in according proper weight to the evidence, but does not prevent the court from considering it. Id. Accordingly, this Court declines to strike Kalika’s affidavit for purposes of the present motion, although it affords it little weight, given the lack of foundation for Kalika’s opinion concerning the impact of the proposed relocation on Wakefield’s business. It is well-established that recoverable monetary loss does not constitute irreparable harm. Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec., 399 *432 Mass. 640, 643 (1987). Given that Wakefield has failed to demonstrate through credible evidence that the relocation would cause it to go out of business, money damages will suffice to compensate for any loss of revenue in Subaru vehicle and service sales incurred in the event that the relocation proves to be arbitrary. See Foreign Motors, Inc. v. Audi of America, Inc., supra at 33-34.
2. Success on the Merits
Finally, it is well-established that the burden of showing a likelihood of success on the merits is on the party seeking the preliminary injunction. Sciaba Constr. Corp. v. Mass. Turnpike Auth., 412 Mass. 606, 608 (1992); Robinson v. Secretary of Admin., 12 Mass.App.Ct. 441, 451 (1981). Injunctive relief is not warranted, even though the plaintiff may suffer irreparable harm without it, where the plaintiff cannot show a probability of success at trial. See Sciaba Constr. Corp. v. Mass. Turnpike Auth., supra at 608; Westwood v. Adams-Russell Co., Inc., 24 Mass.App.Ct. 914, 916 (1987).
In determining whether a proposed grant or appointment of a franchise is arbitrary under c. 93B, §4(3) (1), the court must consider all pertinent circumstances, including but not limited to economic and marketing conditions, including anticipated future changes; the retail sales and service business transacted by the objecting dealer as compared to the business available to it; the investment necessarily made and obligations incurred by the objecting motor vehicle dealer; the permanency of the objecting dealer’s investment; the public welfare; whether the existing dealers in the market area are providing adequate competition and convenient consumer service; whether the dealers have adequate motor vehicle sales and service facilities, equipment and parts to provide for the needs of the customers; and whether the additional franchise would increase competition and therefore be in the public interest. G.L.c. 93B, §4(3)(1) (1994).
Both parties have submitted expert affidavits analyzing these various factors with respect to the proposed relocation of Ira Subaru from Salem to Danvers. Wakefield’s expert, Brandwein, opines that Ira’s presence in Danvers will cause Wakefield to lose 16% of its Subaru sales and service, an annual loss of gross profit of $215,000 and could result in it being forced out of business. He further opines that an additional franchise would not be in the public interest since Wakefield’s going out of business would result in lost jobs, lost warranty service, and lost taxes paid from Wakefield. Moreover, he concludes that the increased competition would so weaken both dealers that neither could provide competent sales and service to the public.
Conversely, SNE’s expert, John G. Firth, the Western Regional Manager of USAI, opines that because market penetration in the Danvers area is only about 69% of the expected average performance, the relocation of Ira Subaru to Danvers would increase market penetration and customer convenience, but would not prevent Wakefield from continuing to sell in the Danvers/ Salem AOR. He further states that any incremental sales made by Ira will come from the lost opportunity from lack of market penetration rather than from Wakefield’s sales. SNE’s Burbank similarly opines that the proposed relocation will benefit all Subaru dealers, including Wakefield, by creating additional exposure for the product and increasing inter-brand competition between Subaru and the other competitors located on the Route 114 Auto Row in Danvers, in an area where Subaru has performed poorly.
SNE has further introduced the affidavit of economics consultant Adam Jaffe, who opines that Brandwein’s analysis improperly uses the general population and demographic statistics as the measure of potential for Subaru sales rather than industry data concerning the car-buying population such as vehicle registration information available from R.L. Polk. Jaffe also states that Brandwein incorrectly portrayed the Massachusetts economy as being in poor shape, and improperly focused only on intra-brand competition without considering inter-brand competition. Finally, Jaffe states that Brandwein’s assumption that sales in the relevant market area would be shared 50/50 by Wakefield and Ira Subaru is unsupported and erroneous, because based on the large number of competing brands in the area and the relatively small share of Subaru in the auto market, a significant portion of Ira’s sales will come at the expense of other kinds of cars.
All of this evidence, in effect, amounts to a battle of experts. However, the record contains certain admissions by Wakefield which detract from its likelihood of prevailing on the merits under c. 93B, §4(3)(1). For example, in his deposition, Kalika admits that the trend of publicity for the Subaru product in 1996 has been very favorable; that Wakefield’s penetration of its own AOR was below the Massachusetts average for 1994, 1995 and 1996; and thatwhen Cityside Subaru opened up 6.71 miles from Wakefield in February of 1995, Wakefield’s new vehicle sales increased 50% during 1995 and 30% from 1995-96, although service sales fell off 15%. Kalika also concedes that on 95% of the sales Wakefield makes, the customer typically comparison shops at two other Subaru dealers, most often Gauthier in Salem, President in Wilmington and Cityside in Arlington. Further, Wakefield’s Scott Scimeme, Director of Operations, concedes that the proposed relocation would make Wakefield the closest dealership to Salem, allowing Wakefield to effectively sell into that geographic area, and that the increased competition as a result of the relocation will probably lower the gross profit on new vehicles which, although bad for Wakefield, benefits consumers. Thus, Wake-field has not established probable success on the *433 merits of its claim that the appointment of Rosenberg as a franchisee and proposed relocation of Ira Subaru from Wakefield to Danvers is arbitrary under c. 93B, §4(3)(1).
A preliminary injunction is a drastic remedy that this Court will not grant unless the movant, by a clear showing, carries its burden of persuasion. Wakefield has failed to show that the balance of harm with respect to an injunction, measured in light of the legal merits, weighs in its favor as against SNE. Accordingly, this Court declines to enjoin the relocation of the Ira Subaru franchise from Salem to Danvers.
ORDER
For the foregoing reasons, it is hereby ORDERED that Subaru of New England’s motion for summary judgment be DENIED. It is further ORDERED that Subaru of Wakefield’s motion for a preliminary injunction be DENIED.

 Warranty service sales occur when a customer brings his vehicle into a dealership for service which is covered by a warranty.

 Kalika states in his deposition that he did not eliminate fraudulent sales from the data because he believed that the fraction of invoices involved was so small compared to the total' as to be insignificant to the outcome.

 This Court also rejects SNE’s argument that c. 93B, §4(3)(1) requires a dealer to delineate its relevant market area as a circle with its dealership as the midpoint. See Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., supra at 406, 421 n. 28 (noting that the judge properly found the plaintiffs relevant market area to be “an irregularly shaped geographic enclosure" and recognizing that while the drawing of circles may be appropriate to determine the overlapping of markets of the protesting and new dealer to support a claim for damages, “in fact, of course, each dealer’s area would probably be irregular in shape”).

 It should be noted that SNE submitted Brandwein’s August 15, 1996 affidavit in support of its motion for summary judgment, while Wakefield produced Brandwein’s November 5, 1996 affidavit in support of its opposition to summary judgment and motion for a preliminary injunction. The November 5th affidavit was created after Brandwein was informed that his initial market analysis and corresponding affidavit were premised on fraudulent as well as unverified warranty service sales data. Insofar as Brandwein’s second market analysis excluded all warranty service sales, it does not suffer from the same reliability defects as the first. Accordingly, this Court declines to strike Brandwein’s November 5, 1996 affidavit as incompetent and inadmissible.

 Section 12A further provides that a franchisee or motor vehicle dealer who suffers a loss of money or property as the result of an unfair method or competition or unfair or deceptive act or practice may bring an action in Superior Court for injunctive relief. G.L.c. 93B, §12A (1994).